UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NIKE, INC.,

       Plaintiff,

v.                          Case No. 8:23-cv-2873-VMC-AAS

EBEN FOX,

       Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff Nike, Inc.'s Motion for Summary Judgment, filed on December 13, 2024. (Doc. # 46). Defendant Eben Fox responded in opposition on February 3, 2025. (Doc. # 56). Nike replied on February 18, 2025. (Doc. # 57). For the reasons set forth below, the Motion is granted in part and denied in part.

**I.  Background**

    **A. The Parties and the Marks**

According to Nike's Director of Brand Protection, Authentication and Innovation, Joe Pallett, "Nike is one of the most famous brands in the world, making it a target for those that profit from the sales and promotion of counterfeit goods." (Pallett Decl. Doc. # 46-73 at ¶ 5). "Nike sells its goods directly to consumers through Nike-owned retail stores

1

and digital platforms (including its websites, social media accounts, and mobile applications), to retail accounts, and to a mix of independent distributors, licensees, and sales representatives." (Id. at ¶ 6). Nike also holds several registered trademarks, including AIR JORDAN, Air Jordan & Wings Design, DUNK, JumpMan Design, NIKE, NIKE & Swoosh Design, and Swoosh Design (collectively, the "Nike Marks"). (Id. at ¶¶ 10-11).

The Nike Marks are associated with the following registrations in the United States Patent and Trademark Office: (1) Reg. No. 1,370,283 for AIR JORDAN, issued on November 12, 1985; (2) Reg. No. 3,725,535 for Air Jordan & Wings Design, issued on December 15, 2009; (3) Reg. No. 3,780,236 for DUNK, issued on April 27, 2010; (4) Reg No. 1,558,100 for JumpMan Design, issued on September 26, 1989; (5) Reg. No. 1,742,019 for JumpMan Design, issued on December 22, 1992; (6) Reg. No. 978,952 for NIKE, issued on February 19, 1974; (7) Reg. No. 1,214,930 for NIKE, issued on November 2, 1982; (8) Reg. No. 1,325,938 for NIKE & Swoosh Design, issued on March 19, 1985; (9) Reg. No. 977,190 for Swoosh Design, issued on January 22, 1974; and (10) Reg. No. 1,323,343 for Swoosh Design, issued on March 5, 1985. (Id. at ¶ 10). Each of the Nike Marks is "valid in full force and

effect, and incontestable." (Id. at ¶ 11; Doc. ## 46-31, 46-32, 46-33, 46-34, 46-35, 46-36, 46-37, 46-38, 46-39). "Nike did not authorize or consent to [Mr. Fox] using the Nike Marks." (Pallett Decl. Doc. # 46-73 at ¶ 12).

Mr. Fox is self-described as "one of the longest lasting replica content creators on social media [o]ver the past 4 years [who has] tried every agent, every seller, and purchased thousands of items." (Doc. # 46-9 at 4; Def. Dep. Doc. # 46-2 at 133:5-25). As a content creator, his sole source of income stems from creating fashion-related content, including content about counterfeits, which Mr. Fox also refers to as "reps," "replicas," or "fakes." (Def. Decl. Doc. # 56-1 at ¶ 2; Def. Dep. Doc. # 46-2 at 13:20-14:2, 18:19-19:2, 39:5-40:7, 42:6-44:11, 46:9-15, 187:7-11).

According to Mr. Fox, he began posting content about fakes in 2020. (Def. Dep. Doc. # 46-2 at 20:9-24). Since then, Mr. Fox has continued to create and post content on several platforms, usually under the username or handle "Cedaz." (Id. at 22:2-23:4, 23:14-19, 26:2-5, 26:10-18; Doc. # 46-38). The platforms used by Mr. Fox include YouTube, TikTok, and Discord. (Def. Dep. Doc. # 46-2 at 303:12-22). Collectively, Mr. Fox amassed over a million followers on social media,

despite multiple account takedowns, and reached almost one million followers on TikTok alone. (Doc. # 46-42 at 3).

### B. **Sale of Counterfeit Nike Goods**

Nike alleges that Mr. Fox distributed and sold multiple counterfeit Nike goods, the full extent of which is unknown partly because Mr. Fox invoked the Fifth Amendment approximately 38 times during his deposition. See, e.g., (Def. Dep. Doc. # 46-2 at 93:15-94:8).

The Discord account "Cedaz – ALWAYS @ ME," made posts offering for sale at least three pairs of "Nike" shoes on the ClosetClearout Discord server in 2023. (Doc. ## 46-43, 46-44, 46-45, 44-46; Def. Dep. Doc. # 46-2 at 272:2-24). Mr. Pallett's review of the images and the below-resale price concluded that the pictured "Nike" shoes in the posts were counterfeits. (Pallett Decl. Doc. # 46-73 at ¶ 13). The three pairs collectively used the AIR JORDAN, Air Jordan & Wings Design, DUNK, NIKE, NIKE & Swoosh Design, and Swoosh Design marks. (Id.). However, in his declaration, Mr. Fox asserts that another individual created a Discord account using Mr. Fox's handle "@cedaz" and profile picture, impersonating him in the Blomi Squad Discord server, and posting and advertising items for sale in 2023. (Def. Decl. Doc. # 56-1 at ¶¶ 9-11). Mr. Fox further claims that he has "never distributed or sold

counterfeit Nike products, including on Discord." (<u>Id.</u> at ¶ 9).

According to Mr. Pallett, Mr. Fox's CashApp transaction records provide evidence of sales of at least eight pairs of counterfeit Nike shoes. (Pallett Decl. Doc. # 46-73 at ¶¶ 14-15; Doc. # 46-22 at 10-18). The descriptions of the CashApp transactions contain references that Mr. Pallett attributes to the following Nike shoes: Air Jordan IV "Black Cat," SB Dunk Low Jedi, Dior x Air Jordan 1 High OG, Nike Air Jordan IV Retro "Lightning," Nike SB Dunk Low "Mummy," AMBUSH x Nike Dunk High "Chicago," Nike Fragment Design x Air Jordan 1 Retro High OG, and Nike Dunk Low Off-White Lot 28 shoes. (Pallett Decl. Doc. # 46-73 at ¶ 15; Doc. # 46-22 at 10-18). Mr. Pallett's review of the transactions indicates that the "Nike" shoes referenced were sold for less than their average resale price and that the eight pairs collectively used each of the Nike Marks. (Pallett Decl. Doc. # 46-73 at ¶ 15). During his deposition, Mr. Fox declined to answer most questions relating to those transactions on Fifth Amendment grounds. (Def. Dep. Doc. # 46-2 at 259:24-264:4). Mr. Fox now asserts in his declaration that he does not recall those transactions or whether they relate to any sale of goods. (Def. Decl. Doc. # 56-1 at ¶ 29).

Again, in his declaration, Mr. Fox asserts that he does "not advertise, sell, offer for sale, promote, or distribute counterfeits," and that he has "never distributed and sold counterfeit Nike products." (Id. at ¶ 7).

### C. **Advertisement and Promotion of Counterfeit Nike Goods**

Mr. Fox admits to partnering with and entering into written agreements with PandaBuy, MuleBuy, and AllChinaBuy. (Def. Dep. Doc. # 46-2 at 95:4-22, 249:18-250:2, 251:1-16; Doc. # 46-7). According to Mr. Pallett, these shipping agents are known counterfeiters. (Pallett Decl. Doc. # 46-73 at ¶¶ 16-26). However, Mr. Fox claims that the shipping agents "are shipping platforms that do not sell any products themselves," but instead operate as a platform for third parties to sell and buy products on. (Def. Decl. Doc. # 56-1 at ¶ 15). According to Mr. Fox, he "does not have any business relationships with any manufacturers or distributors of counterfeit products." (Id.).

The shipping agents financially compensate Mr. Fox for his promotional activities, and he earned $270,000.00 between November 2022 and April 2024 from PandaBuy alone. (Doc. # 46-7; Doc. # 46-48). Yet, Mr. Fox maintains that he does "not create content to advertise or promote counterfeit products,

counterfeit manufacturers or sellers, or any counterfeiters."
(Def. Decl. Doc # 56-1 at ¶ 4).

### 1. **Websites**

First, Mr. Fox co-owns W2C.net that bears the tagline
"THE #1 PLACE FOR YOUR REP NEEDS." (Doc. # 46-9). According
to Mr. Pallett's review, W2C.net linked at least 130
counterfeit Nike products that were available for purchase
from third-party counterfeiters through PandaBuy. (Doc. # 46-
10; Pallett Decl. Doc. # 46-73 at ¶ 27). W2C.net also
contained a "How-To" page, showing visitors how to buy items
through PandaBuy. (Doc. # 46-49).

Next, Mr. Fox operates cedaz.net that contains a "My Rep
Finds!" page linking Mr. Fox's favorite items available for
purchase from third-party sellers through PandaBuy. (Doc. #
46-12; Def. Decl. Doc. # 56-1 at ¶ 26). Mr. Pallet's review
concluded that Mr. Fox linked at least 80 counterfeit Nike
products on cedaz.net, which were available for purchase from
third-party counterfeiters through PandaBuy. (Pallett Decl.
Doc. # 46-73 at ¶ 27). Both websites included uses of each of
the asserted Nike Marks. (Id.).

### 2. **Videos**

Mr. Fox regularly created and posted videos regarding
counterfeit goods on YouTube and TikTok. (Doc. ## 46-40, 46-

51). While Nike claims that the purpose of such videos was to promote counterfeiters and counterfeit goods, Mr. Fox disputes that. (Def. Decl. Doc. # 56-1 at ¶¶ 4, 15-16). Instead, Mr. Fox claims that his videos provide "honest opinions on the quality of replica and authentic products, and [his] thoughts on the role and impact of replica fashion in the fashion industry and in people's lives." (Id. at ¶ 4).

On his YouTube channel, Mr. Fox frequently posted "haul" videos, including a video titled, "My BIGGEST Pandabuy Haul Ever! | 80KG of Hype Streetwear!," in which Mr. Fox displays and reviews three pairs of counterfeit Nike shoes that he represents were acquired through PandaBuy. (Doc. # 46-52 at 4:56-6:32; Doc. # 46-71; Pallett Decl. Doc. # 46-73 at ¶ 30). In another YouTube video titled, "How to Buy Items Off Pandabuy Best Guide Updated 2023-2024," Mr. Fox provides instructions on how to purchase goods through PandaBuy using a pair of "Nike" shoes as an example. (Doc. # 46-6 at 0:41-10:33). Mr. Pallett identified the pair of "Nike" shoes used by Mr. Fox as counterfeit. (Id. at 5:50-6:57; Pallett Decl. Doc # 46-73 at ¶ 31). According to Mr. Pallett, Mr. Fox's instructional videos have encouraged and taught thousands of consumers how to purchase and ship innumerable counterfeit

Nike goods into the United States. (Pallett Decl. Doc # 46-73 at ¶ 43).

Additionally, with over one million views, Mr. Fox's YouTube video, titled "I Returned FAKE Nike Shoes to Nike . . . (SHOCKING)," depicts him successfully returning a pair of counterfeit Nike shoes to a Tampa Nike retail store. (Doc. # 46-61). In the video, Mr. Fox stated that he was "committing a crime" and posting "evidence of fraud," explaining that "we're about to go ahead and return these fake shoes," "we're going to scam Nike so fucking bad," and that "if [he] really wanted to, [he] could go buy 10 pairs of fakes, 10 pairs of reals, exchange them all, and make $900." (Id. at 0:10-0:20, 5:29-5:35, 6:54-6:59). At the end of the video, Mr. Fox tells his viewers to "make sure you go down there and sign up for PandaBuy with my link for shipping discounts — shameless plug, you know me." (Id. at 6:59-7:06).

During his deposition, while he was not entirely sure, Mr. Fox claimed that he returned the better-quality pair and that the video was "click bait." (Def. Dep. Doc. # 46-2 at 175:2-176:12). In his declaration, Mr. Fox reiterates that the video was click bait and that he returned the higher quality pair. (Def. Decl. Doc. # 56-1 at ¶ 21). Mr. Fox's declaration also alleges that "[t]o the best of his knowledge,

[he] returned the authentic pair of Nikes to the store that [he] purchased them from." (Id.). Nevertheless, that video inspired others to replicate Mr. Fox's supposed return fraud, including at least one other YouTuber who filmed himself similarly returning counterfeit Nike shoes to a Nike retailer. (Pallett Decl. Doc. # 46-73 at ¶ 44; Doc. # 46-69).

In yet another YouTube video, titled "I Wore FAKE Nike Mags To SNEAKERCON . . . (SHOCKING)," Mr. Fox filmed himself taking counterfeit Nike shoes to SneakerCon. (Doc. # 46-25 at 3:40-10:32; Doc. # 46-54); Pallett Decl. Doc. # 46-73 at ¶ 32). Mr. Fox's videos include links to sign up with a shipping agent and hashtags such as "#pandabuy," "#stockx," "#nike," and "#ua." (Doc. # 46-54). "UA" means "unauthorized authentic," a common synonym for counterfeit. (Pallett Decl. Doc. # 46-73 at ¶ 33). Again, Mr. Fox encourages his audience to use his sign-up invitation link and "cedaz" affiliate code for discounts. (Doc. # 46-6 at 1:57-2:06, 9:33-9:47).

Mr. Fox maintains that his "videos are edited for shock value, click bait, and entertainment." (Def. Decl. Doc. # 56-1 at ¶ 22).

### 3. Spreadsheets

Mr. Fox has also created spreadsheets listing replicas available for purchase from third-party sellers. Indeed,

pursuant to his agreement with PandaBuy, Mr. Fox created a Google Sheets spreadsheet that, according to Mr. Pallett, listed at least 68 counterfeit Nike goods available for purchase from third-party counterfeiters through PandaBuy. (Doc. # 46-7 at 2; Doc. # 46-53; Pallett Decl. Doc. # 46-73 at ¶ 35). This spreadsheet also included a "cedaz" code and sign-up instructions. (Doc. # 46-53 at 3).

**4. Discord and Individual Social Media Sellers**

Blomi Squad is Mr. Fox's server on Discord. (Def. Dep. Doc. # 46-2 at 208:17-19). The Blomi Squad Discord server included dedicated channels for the following sellers, who Mr. Pallett identified as sellers of counterfeit Nike goods: Yumi Kick, LJR Sneakers, and UaBat. (Doc. ## 46-55, 46-56, 46-57; Pallett Decl. Doc. # 46-73 at ¶¶ 36, 38). Additionally, on his website cedaz.net, Mr. Fox identifies the seller Zoe — who Mr. Pallett also determined to be a counterfeit seller of Nike goods — as "Best MM Seller." (Doc. # 46-58 at 3; Pallett Decl. Doc. # 46-73 at ¶¶ 37-38). The sellers collectively used each of the asserted Nike Marks. (Pallett Decl. Doc. # 46-73 at ¶ 39).

The Blomi Squad Discord server also contained "BST" – an acronym for "Buy, Sell, Trade" – channels where individuals traded goods. (Doc. # 46-59; Def. Dep. Doc. # 46-2 at 118:16-

18). Mr. Fox had knowledge of these BST channels. (Doc. # 46-60). Mr. Pallett explains that the BST channels operate as marketplaces for counterfeit products, including for counterfeit goods bearing each of the Nike Marks. (Pallett Decl. Doc. # 46-73 at ¶¶ 40-41).

Additionally, Mr. Pallett asserts that Mr. Fox's counterfeiting activities and promotion of third-party counterfeiters harms the market for high-quality, genuine Nike products. (Id. at ¶ 42). Admittedly, Mr. Fox is aware that the purpose of counterfeit goods is to deceive consumers and the public into believing they are real. See, e.g., (Doc. # 46-63). Mr. Fox has commented in a video that "if you're telling yourself that you're buying something because you like how it looks, but a fake is almost the exact same and you choose not to buy the fake, then you're lying to yourself . . . you're a fucking fraud." (Doc. # 46-4 at 2:19-2:45).

D. **Procedural History**

On December 15, 2023, Nike initiated this action. (Doc. # 1). In its complaint, Nike alleges trademark infringement under 15 U.S.C. § 1114 (Count I), contributory trademark infringement under 15 U.S.C. § 1114 (Count II), trademark counterfeiting under 15 U.S.C. § 1114(1) (Count III), contributory trademark counterfeiting under 15 U.S.C. §

1114(1) (Count IV), false designation of origin and unfair
competition under 15 U.S.C. § 1125(a) (Count V), trademark
infringement and unfair competition under common law (Count
VI), trademark infringement under Fla. Stat. § 495.131 (Count
VII), and violation of the Florida Deceptive and Unfair Trade
Practices Act (FDUTPA), Fla. Stat. § 501.201 (Count VIII).
(Id. at ¶¶ 108-71).

Nike now moves for summary judgment in its favor. (Doc.
# 46). Mr. Fox responded (Doc. # 56), and Nike replied. (Doc.
# 57). The Motion is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows
that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56(a). A factual dispute alone is not enough to
defeat a properly pled motion for summary judgment; only the
existence of a genuine issue of material fact will preclude
a grant of summary judgment. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a
reasonable jury could return a verdict for the non-moving
party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742
(11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g

Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine

issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

As an initial matter, the Court addresses the adequacy of Mr. Fox's declaration, submitted in opposition to summary judgment. Nike argues that the declaration is conclusory and a sham that should be stricken, or, alternatively, rejected because Mr. Fox invoked the Fifth Amendment multiple times during his deposition. (Doc. # 57 at 2-4).

First, citing to Leigh v. Warner Bros., 212 F.3d 1210, 1217 (11th Cir. 2000), Nike submits that Mr. Fox's "naked denials against Nike's overwhelming evidence fail to create a genuine issue of material fact." (Doc. # 57 at 2). The Court is not persuaded. In Leigh, the court deemed the affidavit to be a brief, conclusory assertion of prior trademark usage, devoid of any facts supporting such prior use and insufficient to create a genuine issue for trial. See 212 F.3d at 1217. In contrast, as seen throughout this Order, Mr. Fox's seven-page

declaration alleges facts sufficient to create genuine issues
as to multiple claims.

According to Nike, Mr. Fox's declaration "is also a sham
that does not create a genuine issue of material fact, as it
'merely contradicts, without explanation, previously given
clear testimony'" (Doc. # 57 at 3) (citing Van T. Junkins &
Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th
Cir. 1984)). Before disregarding an affidavit, however, the
Court must first find an "inherent inconsistency" between the
affidavit and the deposition. Allen v. Bd. of Pub. Educ., 495
F.3d 1306, 1316 (11th Cir. 2007) (citation omitted). To
demonstrate such inconsistency, Nike compares Mr. Fox's
declaration statements denying that he promotes counterfeit
sellers and goods with his deposition testimony that admits
to entering into promotional agreements with the shipping
agents. (Doc. # 57 at 3). The Court has reviewed both
documents and, while the two are not in complete harmony, the
identified deposition testimony and declaration are not
"inherently irreconcilable." Tippens v. Celotex Corp., 805
F.2d 949, 954 n.6 (11th Cir. 1986).

In the allegedly inconsistent deposition testimony, Mr.
Fox did not do more than admit that he promoted PandaBuy as
part of his agreement with PandaBuy. (Def. Dep. Doc. # 46-2

16

at 97:11-22, 98:25-99:7). And, as discussed later, whether PandaBuy is a direct infringer or counterfeiter is an issue to be resolved at trial. Nevertheless, the Court is capable of separating the wheat from the chaff and will not credit any improper statements in Mr. Fox's declaration.

Nike next argues that Mr. Fox's declaration should be rejected due to his "liberal invocation" of the Fifth Amendment during his deposition. (Doc. # 57 at 3-4); see Glock, Inc. v. Glob. Guns & Hunting, Inc., 2015 WL 13614255, at *3 (N.D. Ga. Mar. 30, 2015) ("[I]t is well-settled that '[t]he Fifth Amendment cannot be invoked to oppose discovery and then tossed aside to support a party's assertions.'" (citation omitted)). The Eleventh Circuit has also cautioned that a defendant may not convert his Fifth Amendment privilege from a shield during deposition into a sword at the summary judgment stage. See Fed. Trade Comm'n v. Williams, Scott & Assocs., LLC, 679 F. App'x 836, 838 (11th Cir. 2017) ("By invoking his Fifth Amendment right not to testify at his deposition, Lenyszyn decided that 'the advantages of silence — avoiding incrimination in a criminal investigation' outweighed 'the potential advantages' of attempting to refute the FTC's evidence against him. . . . Having made that choice, Lenyszyn could not then 'convert the privilege from [a] shield

17

. . . into a sword' by putting his version of the facts into written affidavits and avoiding cross-examination.").

Mr. Fox cannot now, after the discovery period has ended, attempt to strategically withdraw his assertion of the Fifth Amendment privilege to avoid summary judgment. See S.E.C. v. BIH Corp., No. 2:10-cv-577-JES-DNF, 2013 WL 6571472, at *2 (M.D. Fla. Dec. 13, 2013) ("Conversely, withdrawal [of the Fifth Amendment privilege] is not permitted if the litigant is trying to 'abuse, manipulate or gain an unfair strategic advantage over opposing parties.'" (quoting Davis-Lynch, Inc. v. Moreno, 667 F.3d 539, 547 (5th Cir. 2012)); Evans v. Capps, No. 7:15-cv-252-BO, 2018 WL 5291864, at *5 (E.D.N.C. Aug. 3, 2018) ("[C]ourts have found that a party may not simultaneously reap the benefits of asserting the Fifth Amendment, while also presenting unchallenged testimony to the court to defeat summary judgment."), report and recommendation adopted, No. 7:15-cv-252-BO, 2018 WL 4635025 (E.D.N.C. Sept. 27, 2018), aff'd, 765 F. App'x 44 (4th Cir. 2019). Accordingly, the Court will strike statements from Mr. Fox's declaration that concern topics on which he previously refused to testify. See (Def. Decl. Doc. # 56-1 at ¶¶ 7, 9-11, 28, 29).

Here, Mr. Fox refused to answer deposition questions asking if he sold counterfeit Nike products, including in connection with the CashApp transactions. See, e.g., (Def. Dep. Doc. # 46-2 at 201:1-7, 209:18-20, 244:1-5, 263:9-12, 264:2-4). Yet, in his declaration, Mr. Fox now categorically denies selling any counterfeit goods, Nike or otherwise, and claims not to remember the CashApp transactions. (Def. Decl. Doc. # 56-1 at ¶¶ 7, 9, 29). Similarly, Mr. Fox categorically denies promoting sellers of goods, counterfeit or otherwise, in his declaration (Id. at ¶¶ 7, 28), despite invoking the Fifth Amendment when asked if he promoted the social media sellers' products during his deposition. (Def. Dep. Doc. # 46-2 at 128:2-5). Finally, Mr. Fox's declaration now alleges that someone else made the Discord posts selling counterfeit goods on the ClosetClearout server. (Def. Decl. Doc. # 56-1 at ¶¶ 9-11). However, during his deposition, Mr. Fox invoked the Fifth Amendment when asked about that server, and whether he made posts selling counterfeit Nike goods on it. (Def. Dep. Doc. # 46-2 at 195:21-25, 197:24-201:7).

Thus, the identified statements in Mr. Fox's declaration that attempt to withdraw the Fifth Amendment privilege are stricken and will not be considered by the Court.

Alternatively, the Court strikes the declaration statements regarding the ClosetClearout Discord posts under the sham affidavit doctrine. To the limited extent that Mr. Fox answered deposition questions regarding those posts, he admitted that his account made at least one of the posts. (Def. Dep. Doc. # 46-2 at 272:2-273:19). That admission is "inherently irreconcilable," Tippens, 805 F.2d at 954 n.6, with his later statements implying that the posts were made by an account impersonating his. (Def. Decl. Doc. # 56-1 at ¶¶ 9-11).

Although the improper statements are stricken, the Court will still consider the remainder of Mr. Fox's declaration. See Aim Recycling of Fla., LLC v. Metals USA, Inc., No. 18-cv-60292, 2020 WL 209860, at *13 (S.D. Fla. Jan. 13, 2020 ("The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in . . . opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." (citation omitted)).

Now, Nike seeks summary judgment on seven of the eight counts asserted in its complaint. Moving to the merits, the Court addresses each in turn.

### A. **Trademark Infringement (Count I)**

Nike moves for summary judgment on its federal trademark infringement claim in Count I based upon Mr. Fox's allegedly undisputed sale and advertising of counterfeit Nike goods, specifically in connection with the following acts: (1) posting counterfeit Nike shoes for sale on Discord; (2) selling counterfeit Nike shoes using CashApp; (3) entering into promotional agreements with PandaBuy and other shipping agents; (4) listing on W2C.net and cedaz.net counterfeit Nike goods available for purchase through PandaBuy; (5) creating videos advertising and promoting counterfeit Nike goods; (6) creating spreadsheets of counterfeit Nike goods available for purchase through PandaBuy; (7) promoting counterfeit Nike sellers on Discord and cedaz.net; and (8) operating BST channels on Discord. (Doc. # 46 at 16-17). The Court evaluates each alleged act individually.

"Trademark infringement under the Lanham Act occurs when a defendant, without consent, uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' that 'is likely to cause confusion' that a relationship exists between the parties." FCOA LLC v. Foremost Title, 57 F.4th 939, 946 (11th Cir. 2023) (citing 15 U.S.C. § 1114(1)). To prevail on a trademark infringement

claim, a plaintiff must establish: "(1) that they possess a valid mark, (2) that the defendant[] used the mark, (3) that the defendant['s] use of the mark occurred 'in commerce,' (4) that the defendant[] used the mark 'in connection with the sale . . . or advertising of any goods,' and (5) that the defendant[] used the mark in a manner likely to confuse consumers." N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1218 (11th Cir. 2008).

In opposition, Mr. Fox argues that Nike failed to establish a likelihood of confusion. (Doc. # 56 at 10-12). Mr. Fox also disputes Nike's evidence that he directly sold counterfeit products to third parties. (Id. at 14).

### 1. **The Cashapp Transactions and Discord Posts**

Nike's Motion relies on three Discord posts in which Mr. Fox offers counterfeit Nike shoes for sale, as well as CashApp transactions that Nike attributes to Mr. Fox's sale of at least eight pairs of counterfeit Nike shoes. (Pallett Decl. Doc. # 46-73 at ¶¶ 13-15).

In connection with the CashApp transactions, Nike "requests an adverse inference as [Mr.] Fox refused to answer on Fifth Amendment grounds." (Doc. # 46 at 8 n.6). "[I]n a civil suit such as this one, the [C]ourt may draw adverse inferences against a party that invokes the Fifth Amendment,"

so long as the adverse inferences do not result in the
"automatic entry" of summary judgment or substitute "the need
for evidence on an ultimate issue of fact." Eagle Hosp.
Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1304
(11th Cir. 2009). A review of Mr. Fox's deposition reveals
that, for the most part, he responded by invoking the Fifth
Amendment when asked about the transaction descriptions.
(Def. Dep. Doc. # 46-2 at 257:10-264:4). Mr. Fox also invoked
the Fifth Amendment each time he was asked if he sold
counterfeit Nike shoes in connection with one of those
transactions. (Id. at 257:25-258:6; 263:9-12; 264:2-4).

In support of summary judgment, Nike provides record
evidence beyond the adverse inference it seeks. Mr. Fox's
CashApp transaction records, combined with Mr. Pallett's
analysis and conclusion that the transactions involved the
sale of counterfeits of the Nike goods identified in the
descriptions, support a finding that Mr. Fox sold counterfeit
Nike goods. The record further shows that Mr. Fox regularly
engaged with counterfeit Nike goods — whether identical or
nearly identical to authentic Nike products — including by
offering such goods for sale on Discord. Based on Nike's
corroborative evidence, the drawing of an adverse inference
is proper. See Am. Airlines, Inc. v. Spada, No. 23-21844-CIV,

2024 WL 4472016, at *6 (S.D. Fla. Sept. 21, 2024) ("Here, the Court may infer that the answers Spada refused to provide on Fifth Amendment grounds would have been unfavorable to him because, as noted above, American has provided substantive probative evidence to corroborate the facts set forth in its SOF."). Even absent an adverse inference, the record here is undisputed. Mr. Fox's only contrary evidence was his declaration, the relevant statements of which were stricken due to his invocation of the Fifth Amendment during his deposition.

The Discord posts alone, even without an actual sale, are sufficient to establish Lanham Act liability. See VersaTop Support Sys., LLC v. Georgia Expo, Inc., 921 F.3d 1364, 1365-66 (Fed. Cir. 2019) (holding that defendant's use of plaintiff's trademarks in advertising was enough to establish trademark infringement liability). Here, the posts were made from Mr. Fox's Discord account, and there is no genuine dispute that he authored them. While Mr. Fox now disputes his authorship, the only evidence he offered to support this theory — statements in his declaration implying that an account imitating his made the sale posts — has been stricken. Thus, the record contains no permissible evidence contradicting that he made the posts.

Because it is undisputed that Mr. Fox sold counterfeit Nike goods in connection with the CashApp transactions, and that Mr. Fox posted the counterfeit Nike shoes for sale on Discord, the first four elements of the federal trademark infringement claim are met. The remaining element is likelihood of confusion.

Nike's Motion applies a presumption of likelihood of confusion. (Doc. # 46 at 15). "Where the defendant[] ha[s] sold counterfeit products . . . intended to look exactly like genuine products and packaging, likelihood of consumer confusion is presumed." GS Holistic, LLC v. Purple Haze of Seminole, LLC, No. 8:22-cv-2113-VMC-AEP, 2023 WL 3629705, at *5 (M.D. Fla. May 8, 2023), report and recommendation adopted, No. 8:22-cv-2113-VMC-AEP, 2023 WL 3620654 (M.D. Fla. May 24, 2023). Likelihood of confusion is thus presumed here.

Because such a presumption is rebuttable, the Court will nevertheless evaluate Mr. Fox's arguments and evidence to the contrary. See H-D U.S.A., LLC v. SunFrog, LLC, 311 F. Supp. 3d 1000, 1032 (E.D. Wis. 2018) ("Of course, the presumption of confusion is rebuttable . . . so the Court will consider whether SunFrog's proffered evidence overcomes it."); PRL USA Holdings, Inc. v. MIR Apparel, LLC, No. 1:21-cv-01936-SDG, 2023 WL 6326617, at *3 (N.D. Ga. Sept. 28, 2023) ("[T]here is

25

a presumption that counterfeit goods cause confusion. In fact, that is the entire point of a counterfeit good. Defendants have not rebutted this inference.").

Without proffering any permissible evidence in support, Mr. Fox argues that "[n]ot only is there a genuine issue of material fact as to whether [Mr. Fox] ever even sold counterfeit Nike products, but there remains the genuine issue of material fact as to whether a consumer would have been confused as to the authenticity of any products [Mr. Fox] allegedly sold." (Doc. # 56 at 14). Absent more, these conclusory assertions do not create a genuine issue of material fact or overcome the presumption of likelihood of confusion.

Accordingly, summary judgment is granted as to liability in connection with the CashApp transactions and Discord posts in Count I.

### 2. **Online Promotional Activity**

The Court next addresses the slew of infringing online promotional activity that Mr. Fox allegedly committed. Nike does not allege that Mr. Fox sold counterfeit Nike products in connection with his broader online promotional activity. Thus, rather than apply any presumption here, the Court will conduct a likelihood of confusion analysis.

There are two steps in this inquiry. FCOA LLC, 57 F.4th
at 947. First, reviewing all relevant evidence and drawing
all reasonable inferences in favor of the non-moving party,
the Court considers seven factors to "yield 'circumstantial
facts' that shed light on the likelihood of confusion as a
whole." Id. The seven factors are:

> (1) the strength of the allegedly infringed mark;
> (2) the similarity of the infringed and infringing
> marks; (3) the similarity of the goods and services
> the marks represent; (4) the similarity of the
> parties' trade channels and customers; (5) the
> similarity of advertising media used by the
> parties; (6) the intent of the alleged infringer to
> misappropriate the proprietor's good will; and (7)
> the existence and extent of actual confusion in the
> consuming public.

Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc., 830
F.3d 1242, 1255 (11th Cir. 2016). "Of these factors, the type
of mark and the evidence of actual confusion are the most
important." Id. "At step two, the [C]ourt weighs the relative
importance of the circumstantial facts and determines whether
these facts, taken in the light most favorable to the non-
movant, would permit a reasonable fact finder to infer
likelihood of confusion." FCOA LLC, 57 F.4th at 947.

### a. **Step One**

The strength of the Nike Marks is undisputed. Nike
submits that Mr. Fox used the Nike Marks in identical or near

identical form, on identical goods, that were advertised or
sold using the same channels. (Doc. # 46 at 17). Mr. Fox does
not address the first five factors, and the undisputed facts
nevertheless support a finding that those circumstantial
facts each weigh in Nike's favor. The Court thus focuses its
analysis on the two factors that Mr. Fox contests: intent and
actual confusion.

### i.    **Mr. Fox's Intent**

The intent factor favors Nike. In weighing this factor,
the Court must examine whether Mr. Fox "had a conscious intent
to capitalize on the plaintiff's business reputation, was
intentionally blind, or otherwise manifested improper
intent." Fla. Int'l Univ. Bd. of Trustees, 830 F.3d at 1263
(quoting Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.,
508 F.3d 641, 648 (11th Cir. 2007)). Nike argues that because
Mr. Fox sold and promoted "undisputedly clear-cut copies, .
. . the Court can thus infer that [Mr.] Fox intended to
benefit from Nike's reputation when he sold and promoted goods
bearing [the] Nike Marks." (Doc. # 57 at 5).

The Court concludes that a reasonable jury could find
that Mr. Fox intended to capitalize upon Nike's reputation
and goodwill. Mr. Fox's videos and online content necessarily
rely on the public's interest in Nike and its business

reputation in order to receive viewership or online traction. Furthermore, Mr. Fox's use of descriptors such as "fake," "reps," or "replicas," constitute evidence that Mr. Fox knowingly used counterfeits of the Nike Marks. See Chanel, Inc. v. Stevens, No. 07-81201-CIV, 2009 WL 10668566, at *5 (S.D. Fla. Oct. 20, 2009) ("In describing her products, Defendant used phrases such as 'mirror image,' 'knockoffs,' 'authentic quality replica handbags.' . . . Use of such disclaimers constitutes evidence of Defendant's knowing use of counterfeits of the Chanel Marks."). At a minimum, the record supports a finding that Mr. Fox was willfully blind to Nike's trademark rights. See Id.

Mr. Fox argues that he "has never had any intent to confuse or deceive any consumer about the authenticity of products he displays online, including products bearing [the Nike Marks]." (Doc. # 56 at 13-14). But even accepting that Mr. Fox did not intend to portray counterfeit Nike products as authentic, he did intend to benefit from the business reputation of the Nike Marks. See United States v. Torkington, 812 F.2d 1347, 1355 n.9 (11th Cir. 1987) ("Although defendant claims that he did not intend to 'palm off' the replica Rolexes as being authentic, it appears that he intended to traffic in goods that he knew would be desirable to consumers

29

because the goods would be identified by the public as those of the authentic trademark owner.").

### ii.  Actual Confusion

While not required to establish likelihood of confusion, "evidence of actual confusion is the best evidence of a likelihood of confusion." Frehling Enters., Inc. v. Int'l Select Grp., Inc., 192 F.3d 1330, 1340 (11th Cir. 1999). According to Mr. Fox, consumers have never been confused by his content, and Nike has not provided any evidence of actual confusion. (Doc. # 56 at 13-15).

Nike's only evidence of actual confusion are Mr. Fox's YouTube videos which depict members of the public believing that counterfeit Nike shoes worn by Mr. Fox were authentic. (Doc. # 46 at 17; Doc. # 57 at 6). Mr. Fox disputes the probative nature of the videos, asserting that his content is edited and does not depict the reality of consumer confusion. (Doc. # 56 at 14). Mr. Fox also claims that he openly identifies any counterfeit goods as such to his viewers. (Def. Decl. Doc. # 56-1 at ¶¶ 19-24). Drawing all reasonable inferences in Mr. Fox's favor, a factfinder could conclude that the videos do not demonstrate actual confusion.

### b. **Step Two**

At the second step, the Court weighs the circumstantial evidence and determines whether a reasonable jury, viewing the evidence in the light most favorable to Mr. Fox, could only find a likelihood of confusion. <u>FCOA LLC</u>, 57 F.4th at 947. Although the first six factors favor Nike, the Court cannot conclude that Nike established likelihood of confusion as a matter of law. Without evidence of actual confusion, a reasonable jury could still find no likelihood of confusion in connection with Mr. Fox's shipping agent affiliations, websites, videos, spreadsheets, promotion of counterfeit sellers, and BST channels.

Thus, Count I must proceed to trial as to those allegedly infringing acts and summary judgment is denied.

### B. **Trademark Counterfeiting (Count III)**

Next, Nike moves for summary judgment on its federal counterfeiting claim in Count III. (Doc. # 46 at 15-16). This claim is based on the same underlying conduct as Nike's federal trademark infringement claim. Accordingly, Mr. Fox contends that the counterfeiting claim fails for the same reasons as the trademark infringement claim. (Doc. # 56 at 15-16).

"[T]he Lanham Act imposes liability for trademark counterfeiting on any person who shall 'use in commerce . . . any counterfeit . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]'" <u>Bentley Motors Corp. v. McEntegart</u>, 976 F. Supp. 2d 1297, 1312 (M.D. Fla. 2013) (quotation omitted).

Because Nike established that Mr. Fox offered for sale and sold counterfeit Nike products, summary judgment is also granted in connection with the CashApp transactions and Discord posts in Count III. For the reasons explained in the prior section, summary judgment is denied in connection with the rest of the alleged acts in Count III.

**C. <u>Contributory     Trademark     Counterfeiting     and Infringement (Counts II and IV)</u>**

Nike also seeks summary judgment in its favor on Counts II and IV, for contributory infringement and for contributory counterfeiting, respectively, on the grounds that Mr. Fox knowingly provided promotional services to direct counterfeiters. (Doc. # 46 at 18-20).

"Under the Lanham Act, the owner of a registered trademark may hold someone contributorily liable for trademark infringement if that person induces or knowingly facilitates the infringement." Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC, 932 F.3d 1303, 1311 (11th Cir. 2019). To prevail on a contributory trademark counterfeiting or infringement claim, a plaintiff must prove two elements: "(1) a person or entity commit[ted] direct trademark infringement under the Lanham Act; and (2) the defendant (a) 'intentionally induce[d]' the direct infringer to commit infringement, (b) supplie[d] a 'product' to the direct infringer whom it 'knows' is directly infringing (actual knowledge), or (c) supplie[d] a 'product' to the direct infringer whom it 'has reason to know' is directly infringing (constructive knowledge)." Id. at 1312; see also Platinum Props. Inv. Network, Inc. v. Sells, No. 18-61907-CIV, 2021 WL 4429067, at *11 (S.D. Fla. Feb. 9, 2021) (applying same elements to analyze both contributory infringement and counterfeiting claims). The provision of a service is considered a "product." See Platinum Props. Inv. Network, Inc., 2021 WL 4429067, at *12.

According to Nike, Mr. Fox is contributorily liable for direct infringements committed both by (1) PandaBuy and other

shipping agents, and (2) certain social media sellers. (Id.). The Court addresses each argument in turn.

### 1. **The Shipping Agents**

The Court first determines that Nike is not entitled to summary judgment on Mr. Fox's contributory liability for the shipping agents. Here, a genuine dispute of material fact exists as to whether PandaBuy and the shipping agents are direct infringers for the purposes of finding Mr. Fox contributorily liable.

Nike's Motion does not cite any cases to support that the shipping agents are direct infringers. In contrast, Mr. Fox argues that PandaBuy and the shipping agents are more akin to passive facilitators. See KAWS, Inc. v. Printify Inc., No. 23-cv-24063, 2024 WL 3916493, at *4 (S.D. Fla. Aug. 23, 2024) ("[O]nline marketplaces, like eBay and Amazon, that facilitate sales for independent vendors generally escape Lanham Act liability." (citation omitted)); King Spider LLC v. Panda (Hong Kong) Tech. Co., No. 24-cv-2668 (JGLC), 2025 WL 89123, at *1 (S.D.N.Y. Jan. 14, 2025) ("Because the evidence now before the Court indicates Pandabuy operates more like a passive facilitator than a seller or manufacturer, the Court must dissolve the Preliminary Injunction.").

Instead, Nike relies solely on Mr. Pallet's testimony to establish that the shipping agents are direct infringers. (Doc. # 46 at 18). Whether the shipping agents are direct infringers, however, is factually disputed. Compare (Pallett Decl. Doc. # 46-73 at ¶ 19 (claiming that "PandaBuy sells or has sold counterfeit Nike-branded products")), with (Def. Decl. Doc. # 56-1 at ¶ 15 (asserting that the shipping agents are "shipping platforms that do not sell any products themselves")). It is the role of the jury to resolve this genuine issue of material fact at trial. Therefore, the Motion is denied as to the shipping agents in Counts II and IV.

### 2. **Social Media Sellers**

Nike is entitled to summary judgment on its claim that Mr. Fox is contributorily liable for the social media sellers. Notably, Mr. Fox did not address Nike's argument regarding the social media sellers in his response. (Doc. # 57 at 7). By failing to respond and instead focusing solely on the shipping agents, Mr. Fox waived the argument as to his liability for the social media sellers, thus warranting summary judgment on the issue. (Doc. # 56 at 15-16); see also Holiday Hosp. Franchising, LLC v. J&W Lodging, LLC, No. 1:17-cv-01663-ELR, 2019 WL 3334614, at *3 (N.D. Ga. Mar. 7, 2019) ("[Defendant's] failure to address Plaintiff's claims

regarding the breach element constitutes abandonment of that issue resulting in the Court granting Plaintiff's Motion for Partial Summary Judgment as to Defendant['s] liability."); Grant v. Miami-Dade Cty., No. 13-22008-CIV, 2014 WL 7928394, at *9 (S.D. Fla. Dec. 11, 2014) ("Where a [party] fails to respond to an argument in a motion for summary judgment, he waives the argument. Summary judgment [on that issue] is appropriate."), aff'd sub nom., 636 F. App'x 462 (11th Cir. 2015).

Even if the Court were to ignore the waiver, the Court would still conclude that Mr. Fox is contributorily liable. Nike put forth evidence that the identified social media sellers sell counterfeit Nike products. Mr. Pallett analyzed each sellers' social media account and/or website to make that determination. (Pallett Decl. Doc. # 46-73 at ¶¶ 36-39). Mr. Fox provides no evidence to the contrary. Because the sellers are direct infringers, the first element has been met.

Nike has also established the second element. It is undisputed that Mr. Fox provided the sellers with dedicated channels and occasional introductions on his Blomi Squad Discord server and that he referenced another seller on cedaz.net — promotional services that facilitated the

36

sellers' direct infringements. See Platinum Pros. Inv. Network, Inc., 2021 WL 4429067, at *12 (granting summary judgment on contributory counterfeiting and infringement claims against defendants who knew, or should have known, that they were providing digital marketing services to direct counterfeiters). Indeed, the only contrary evidence that Mr. Fox offered to dispute this were his stricken declaration statements that his mentioning of sellers was not an act of promotion, and that he does not promote any sellers. (Def. Decl. Doc. # 56-1 at ¶¶ 7, 28). Nothing in the rest of Mr. Fox's declaration creates a material dispute as to the social media sellers.

Furthermore, Mr. Fox's promotional acts, taken in the context of his admitted familiarity with counterfeit fashion, support a finding that Mr. Fox, at a minimum, deliberately avoided investigating what was readily apparent and acted with willful blindness when promoting these sellers. See Luxottica Group, S.p.A, 932 F.3d at 1303 (noting that "willful blindness is a form of constructive knowledge for contributory trademark infringement" that "occurs when a person 'suspect[s] wrongdoing and deliberately fail[s] to investigate.'" (citation omitted)).

37

Summary judgment is thus granted as to Mr. Fox's liability in connection with the social media sellers in Counts II and IV. But these counts will proceed to trial as to the shipping agents.

**D. False Designation of Origin and Unfair Competition (Count V) and Common Law Trademark Infringement and Unfair Competition (Count VI)**

Nike next moves for summary judgment on its Lanham Act unfair competition claim in Count V, and its common law trademark infringement and unfair competition claims in Count VI. (Doc. # 46 at 17).

Under the Lanham Act, "[a]n unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim." <u>Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.</u>, 889 F.2d 1018, 1025-26 n.14 (11th Cir. 1990). The Eleventh Circuit has also determined that the legal analysis is virtually identical for common law claims for unfair competition and trademark infringement. <u>See</u> <u>Gift of Learning Found., Inc. v. TGC, Inc.</u>, 329 F.3d 792, 802 (11th Cir. 2003) (noting "the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim").

Therefore, as the parties recognize, Nike's federal trademark infringement claim is dispositive as to those two claims. (Doc. # 46 at 17 n.14; Doc. # 56 at 11). For the same reasons that summary judgment is granted in part and denied in part on the federal trademark infringement claim, the Motion is likewise granted in part and denied in part as to liability on Nike's claims in Counts V and VI.

**E. Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count VIII)**

Nike last asserts that it is entitled to summary judgment on its FDUTPA claim in Count VIII because it is undisputed that Mr. Fox returned counterfeit Nike shoes to a Nike retail store in Tampa. (Doc. # 46 at 20-21). To prevail on a FDUTPA claim, a plaintiff must establish: "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." Dolphin LLC v. WCI Cmtys., Inc., 715 F.3d 1243, 1250 (11th Cir. 2013). "A practice is "unfair" if it is "immoral, unethical, . . . or substantially injurious to consumers." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003). However, there exists a genuine issue of material fact here as to whether Mr. Fox returned counterfeit or authentic shoes to the Nike retail store.

According to Mr. Fox, "to the best of [his] knowledge, [he] returned the authentic pair of Nikes to the store that [he] purchased them from." (Def. Decl. Doc. # 56-1 at ¶ 21). While there is video evidence of Mr. Fox returning what appear to be counterfeit Nike shoes to a Nike retail store (Doc. # 46-69), Mr. Fox counters that the video was edited as click bait. (Def. Decl. Doc. # 56-1 at ¶ 21). Taking the evidence in the light most favorable to Mr. Fox, a reasonable jury could credit his testimony and determine that Mr. Fox did not return counterfeit Nike shoes.

Thus, the Court is precluded from granting summary judgment on the FDUTPA claim. It is the role of the jury to weigh the evidence and make a credibility determination regarding Mr. Fox's version of events at trial. The Motion is denied as to Count VIII.

### F. **Permanent Injunction and Damages**

Finally, Nike submits that, based on the record, the Court should determine that Mr. Fox's counterfeiting and infringement was willful as a matter of law. (Doc. # 46 at 21-22). Nike asks the Court to award the maximum amount of statutory damages — $18,000,000.00 — due to Mr. Fox's allegedly willful conduct. (Id. at 22-23). Nike also seeks

attorney's fees and a permanent injunction. (Id. at 24-25). Mr. Fox opposes the relief sought. (Doc. # 56 at 17-20).

At this juncture, the Court declines to grant summary judgment on the issue of willfulness for purposes of determining an award of statutory damages or an award of attorney's fees. See Bentley Motors Corp, 976 F. Supp. 2d at 1318 (granting summary judgment as to liability but "declin[ing] to grant summary judgment on the issue of willfulness for purposes of determining the appropriate award of statutory damages. . .").

However, Nike is entitled to a permanent injunction. To obtain a permanent injunction, a plaintiff "must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008). "[C]omplete injunctions against the infringing party are the order of the day" in trademark infringement actions. Id. at 1209. Moreover, in such cases, it is generally recognized "that (1) there is no[] adequate remedy at law to

redress infringement and (2) infringement by its nature causes irreparable harm." Tally-Ho, Inc., 889 F.2d at 1029.

Therefore, because Mr. Fox is liable for infringing the Nike Marks to the extent set forth in this Order, the Court concludes that Nike is entitled to a permanent injunction against Mr. Fox. A permanent injunction will be entered at the end of the case.

Accordingly, it is hereby

**ORDERED**, **ADJUDGED**, and **DECREED**:

Plaintiff Nike, Inc.'s Motion for Summary Judgment (Doc. # 46) is **GRANTED** in part and **DENIED** in part as set forth in this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 21st day of April, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE